In re The **MACON TELEGRAPH PUBLISHING COMPANY.**

No. 5:95–mc–64 (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

Oct. 13, 1995.

Ed S. Sell, III, Macon, GA, for Macon Telegraph Publishing Co.

### *ORDER*

OWENS, District Judge.

Before the court is a motion by the Macon Telegraph Publishing Company ("Telegraph") for the court to order certain search warrants, and affidavits filed in support thereof, to be unsealed for the purpose of public inspection. After careful consideration of this matter, the court issues the following order.

### *I. FACTS*

On August 18, 1995, a special agent of the Federal Bureau of Investigation ("FBI"), pursuant to Federal Rule of Criminal Procedure ("FED.R.CRIM.P.") 41, applied for a warrant to search the property or premises known as the Putnam County Law Enforcement Complex, 111 Ridley Drive, Eatonton, Georgia. The application made was also for

a warrant to search the property or premises known as Rountree Foodland, 228 Jefferson Street, Eatonton, Georgia. Each application was supported by the special agent's affidavit of facts, which demonstrated probable cause to believe that a search of each property might result in the discovery and seizure of evidence that a crime against the United States had been committed.

A magistrate judge of this court issued Rule 41 warrants authorizing the requested searches. Upon motion by the government, the applications and affidavits for search, the search warrants, affidavits and attachments in relation to both searches were sealed by order of the magistrate judge who issued the warrants. The magistrate judge found that the "sensitive nature of the information" contained in these documents necessitated maintaining their status as sealed until further order of the court.

On August 21, 1995, agents of the FBI and Internal Revenue Service ("IRS") served the above-referenced warrants on the Putnam County Sheriff's Office and Rountree Foodland. Those serving the warrants left a copy thereof as required. But only a copy of the warrant itself was left, for Rule 41 requires no more. A proper inventory of materials seized was made and returned to the magistrate judge who issued the warrants. That also remains under seal.

Since that time, Putnam County Sheriff Gene Resseau's attorney has issued a press release, as has the Atlanta office of the FBI. The sheriff's attorney has been quite vocal about the investigation. None of those speculations are to be confirmed or denied by this court at this time.

As of today's date, the fruits of the search warrants have not caused any person to be arrested or charged by criminal information or indictment for violating the laws of the United States. The United States Attorney has certified in court papers filed in response to this motion that the investigation is ongoing.

On August 24, 1995, the Macon Telegraph Publishing Company moved this court "to release for public inspection all documents filed in connection with the search and sei-

zure of records in the Putnam County Sheriff's Office . . . ." This would include the affidavits filed in support of the search warrant. Movant argues that the public possesses a qualified First Amendment right of access to these documents: "The public is entitled to have access to and the right to inspect such documents." Therefore, under typical constitutional analysis, the government would have to demonstrate a "compelling" interest to justify keeping the documents under seal. Movant contends that, because the warrants have been executed, there is no justification for continuation of their sealed status. Movant's contentions are modeled upon the decision *In re Search Warrant for Secretarial Area–Gunn,* 855 F.2d 569 (8th Cir.1988).

The government opposes the authority cited by movant with citation to Fourth and Ninth Circuit authority that has created a split among circuits. The government's authority stands for the proposition that the First Amendment right of public access, although it does exist, does not extend to criminal procedures that occur in the pre-indictment stage. Such a right does not come into being, the government would contend, until much later in the criminal process. The government does concede the existence of a right; however, rather than one guaranteed by the Constitution, the government would allow only for a common law right of access by the public to public documents.

## II. DISCUSSION

### A. Controlling Law

There are two possible sources for a right that would be relevant in the context of this motion: a First Amendment right of public access, and the common law right of access to public documents.

#### 1. Common Law Rights

In *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978), the Supreme Court condoned many lower courts' holdings that recognized "a general right to inspect and copy public records and documents, including judicial records and documents." Although the contours of this common law right of inspection had not been thoroughly defined,

the right was clearly not absolute. *Id.* at 598, 98 S.Ct. at 1312. Whether concerns paramount to the "right of access" existed in a particular case was a determination left to the district court's sound discretion. *Id.* at 599, 98 S.Ct. at 1312. The Court in *Nixon* did not mention the First Amendment as the source of this or any similar right.

■ A common law right of public access exists in all instances. Whether the public may exercise that right in a particular context, or whether that right is outweighed by paramount concerns, is a different question.

### 2. First Amendment Rights

The First Amendment right of public access to criminal trials was initially recognized in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). The First Amendment right, however, was seemingly limited to criminal *trials,* which had been historically open to the public, as opposed to criminal proceedings in general. *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 605, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982). Subsequent cases indicated, however, that extension of the First Amendment right to proceedings ancillary to a criminal trial, such as suppression hearings and the juror selection process, was to be determined on an ad hoc basis. *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 7–9, 106 S.Ct. 2735, 2739–41, 92 L.Ed.2d 1 (1986) (*Press–Enterprise II*). *See also Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*Press–Enterprise I*).

■ Whether the First Amendment right of access is to be extended depends upon two considerations. First, whether the place and process to which access is sought "have historically been open to the press and general public." *Press–Enterprise II,* 478 U.S. at 8, 106 S.Ct. at 2740. The second consideration is "whether public access plays a significant role in the functioning of the particular process in question." *Id.* In regard to the second consideration, the Supreme Court has stated that a classic example of a government operation "that would be totally frustrated if conducted openly ... is ... our grand jury system [which] depends upon the secrecy of

grand jury proceedings." *Id.* at 9, 106 S.Ct. at 2740.

At least three circuit courts of appeals have considered the nature of access rights possessed by the public in regard to search warrants and the affidavits filed in support thereof. The Eighth Circuit found that "the first amendment right of public access does extend to the documents filed in support of search warrant applications." *In re Search Warrant for Secretarial Area–Gunn,* 855 F.2d 569, 573 (8th Cir.1988). The Eighth Circuit justified this conclusion because the search warrant formed "an integral part of a criminal prosecution. Search warrants are at the center of pre-trial suppression hearings, and suppression issues often determine the outcome of criminal prosecutions." *Id.*

Both the Fourth and Ninth Circuits have declined to extend the First Amendment right of public access to search warrants and the affidavits supporting them. *Baltimore Sun Co. v. Goetz,* 886 F.2d 60 (4th Cir.1989); *Times Mirror Co. v. United States,* 873 F.2d 1210 (9th Cir.1989). The Fourth Circuit found that search warrant applications were traditionally conducted *ex parte* because of the danger of tipping off the suspect or disclosing the mechanics of an on-going investigation. Thus this particular procedure failed the first prong of the *Press–Enterprise II* test. *Goetz,* 886 F.2d at 64. Similarly, the Ninth Circuit failed to find any historical tradition of openness in the warrant application/issuance process. *Times Mirror,* 873 F.2d at 1214. Indeed, such proceedings were necessarily *ex parte* and *in camera* for obvious reasons. Neither did the Ninth Circuit find, under the second prong of the *Press–Enterprise II* test, that the warrant issuance process would benefit from public access and scrutiny. In this regard, the warrant issuing procedure was indistinguishable from grand jury proceedings, which the Supreme Court had found to be the classic example of a government operation that would be hindered by public access. *Id.* at 1215.

■ The court agrees with the Fourth and Ninth Circuits, and in the absence of any controlling authority from the Eleventh Circuit, chooses to follow their holdings: no

First Amendment right of public access to search warrants, and affidavits filed in support thereof, exists. *See also Matter of Flower Aviation of Kansas, Inc.*, 789 F.Supp. 366, 368 (D.Kan.1992) (adopting *Baltimore Sun* in absence of Tenth Circuit authority). And this is so even after the search warrants have been executed, to the extent that secrecy of the warrant materials is necessary to preserve the grand jury's processes inviolate.[1]

Certain things are kept quiet, and usually for good reasons. We do not allow the public access to jury deliberations (jurors would not be as willing to speak their minds, hence litigants would be deprived of a fair trial); the public may be barred from juvenile matters (transgressions of youth should not be publicized, and thus follow us for the remainder of our days); nor is the public allowed access to the grand jury (compromise of the cornerstone of the American criminal justice system). The inherent nature in the last of these examples, like the present situation, simply precludes the extension of First Amendment rights to public access in every instance. The very nature of the grand jury proceeding, and investigative proceedings generally, is secretive. To compromise that aspect of the object is to destroy the thing itself. The court refuses to find the existence of a right that would in some circumstances possibly destroy institutions (such as the grand jury and warrant issuance processes) so valuable and necessary to society.

### B. Common Law Analysis

█ Despite the absence of a First Amendment right, the common law right of access to public documents remains. The court will thus employ the mode of analysis and burdens of proof appropriate to that common law right. *See Nixon*, 435 U.S. at 599, 98 S.Ct. at 1312–13.

The court has reviewed the sealed materials *in camera*. The Assistant United States Attorney has asked that the warrant applications, affidavits in support thereof, exhibits

and returns of seized property remain under seal because, if opened,

1. Targets of the investigation will be identified;

2. Witnesses, both named and unnamed, will be identified;

3. The scope and direction of the investigation will be identified;

4. Targets will be able to tailor their defenses based upon information in the affidavits;

5. Targets and witnesses can destroy and alter evidence based upon disclosure of information in the affidavits;

6. Premature disclosure of electronic monitoring techniques and other investigative tools that may have been employed and may still be in use will be revealed; and

7. Evidence will be revealed.

Brief of Government, at 8. The government has also submitted for the court's *in camera* inspection redacted versions of the affidavits filed in support of the search warrants.

In approaching this issue, it is important to understand the function of search warrants in our system of criminal jurisprudence. Search warrants are a part of the investigative process whereby law enforcement officials determine whether or not there is evidence of the *possible* commission of a crime. If so, that evidence is presented to the grand jury of this court, which is then asked to indict one or more persons on the basis of that evidence. A search warrant is not a charge of criminal misconduct. Often times, innocent individuals are necessarily, but unfortunately, the target of search warrants. Any smear upon an innocent individual's good name that would be caused by a release of information surrounding the execution of a search warrant will not be removed in the eyes of the public until such time as the grand jury refuses to return an indictment. Even then, character rehabilitation is much more difficult than denigration caused by revealing information relative to an investiga-

---

1. The grand jury has not yet been asked to return an indictment in relation to this investigation, which is presently on-going.

The court also notes, in the post-execution context, that FED.R.CRIM.P. 41(g) does not preclude the magistrate judge from filing the papers that are returned under seal.

tion of that person. As one court has observed, keeping pre-indictment documents that are related to a search warrant under seal serves the important "public interest in fairness to any innocent person (and there may well be some) who are shown by the documents as being linked to the investigation." *In re Search Warrant for Secretarial Area–Gunn*, 855 F.2d at 575 (Bowman, J., concurring).

Further, continuation of the sealing order in this instance serves other important public interests, "including the public interest in knowing the facts produced by an uncompromised investigation, [and] the public interest in the successful prosecution of [those who have committed crimes against the United States]." *In re Search Warrant for Secretarial Area–Gunn*, 855 F.2d at 575 (Bowman, J., concurring).

With due regard for the relevant facts and circumstances, the court finds that the documents should remain under seal until further order of the court.

**SO ORDERED.**